AMOCO OIL COMPANY

v.

LOCAL 99, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, et al.

Civ. A. No. 81–0554.

United States District Court,
D. Rhode Island.

March 29, 1982.

Thomas J. McAndrew, Daniel K. Kinder, Providence, R. I., for plaintiff.

Arthur J. Flamm, Boston, Mass., Julius Michaelson, Providence, R. I., for defendants.

## OPINION AND ORDER

PETTINE, Chief Judge.

The plaintiff, Amoco Oil Company [hereinafter "Amoco"], brings this action against several labor unions and certain union officers for compensatory and punitive damages arising out of a labor dispute. The defendant unions consist of: the International Brotherhood of Electrical Workers [hereinafter "IBEW"]; Local 99 of the IBEW [hereinafter "Local 99"]; the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada [hereinafter "Plumbers"]; Steamfitters Union Local 476 affiliated with the Plumbers [hereinafter "Local 476"]; the United Brotherhood of Carpenters and Joiners of America, AFL–CIO [hereinafter "Carpenters"]; the Carpenters District Council [hereinafter "District Council"]; and the Providence, Rhode Island Building and Construction Trades Council [hereinafter "Trades Council"]. The individual defendants, sued in both their individual and representative capacities, consist of: The Business Manager, the President, the Financial Secretary, and the Recording Secretary of Local 99; the President and the Secretary of the IBEW; the President, the Business Manager, the Financial Secretary/Treasurer, and the Recording Secretary of Local 476; the President and the Secretary of the Plumbers; the President, the Business Manager, and

the Secretary of the District Council; the Business Manager, the President, and the Secretary of the Carpenters; and the President, the past President, and the Secretary of the Trades Council.[1]

Amoco alleges that the local unions and their individual members have violated both state and federal law by engaging in secondary picketing against it in order to induce it to cease dealing with certain other employers. Amoco further alleges that the international unions and their individual officers have similarly violated state and federal law by instigating, approving, or encouraging the conduct of their local affiliates. Amoco claims that it is entitled to relief under the Civil Rights Act of 1871, 42 U.S.C. § 1985(3)[2], the National Labor Relations Act, 29 U.S.C. §§ 158(b)(4)(B)[3], 185(a)[4], 187[5], and federal common law.

[1]. In this opinion, the Court will refer to the IBEW, Plumbers, and Carpenters collectively as the "national unions." Their officers whom Amoco has sued in this action are collectively referred to as "national union members" and "national union officers." Furthermore, the term "local unions" will refer collectively to the District Council, the Trades Council, Local 99, and Local 476. Finally, their officers and past officers who are sued in this action are collectively referred to as "local union members" and "local union officers."

[2]. This statute provides in relevant part:

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ...; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

[3]. This statute provides:

It shall be an unfair labor practice for a labor organization or its agents—
...(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—...
(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;
. . .
*Provided*, That nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this sub-chapter: *Provided* further, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution....

29 U.S.C. § 158(b)(4)(B).

[4]. This statute provides:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).

[5]. This statute provides:

(a) It shall be unlawful, for the purpose of this section only, in an industry or activity

Furthermore, Amoco seeks relief under various pendent state law claims for tortious interference with business relationships, destruction of property, and trespass. The Court now has before it several motions to dismiss for lack of personal jurisdiction and subject matter jurisdiction, and for failure to state a claim.[6] In addition, the local unions and their individual members have also moved to strike portions of Amoco's complaint pursuant to Fed.R.Civ.P. 12(f).

## FACTS

In its complaint, Amoco alleges that in August 1980 it entered contracts with Dexter Electrical Company [hereinafter "Dexter"] and Web Construction Company [hereinafter "Web"][7]. Web agreed to construct a loading ramp and "vapor system" for Amoco at Amoco's terminal in East Providence, Rhode Island. Dexter agreed to perform electrical work in connection with this construction. Dexter and Web, which both began work at the terminal about August 8, 1980, are non-union employers.

Amoco alleges that Local 99, displeased about Amoco's hiring non-union contractors, attempted to induce a walkout by Amoco's own employees, who are represented by Local 8–366 of the Oil, Chemical, and Atomic Workers' International Union, in protest of Amoco's hiring decisions. Amoco further alleges that on August 26, 1980 Local 99 began to picket the main entrance to Amoco's terminal, through which Dexter and Web employees entered. The picketers carried placards stating that Dexter "does not hire union electricians." Amoco alleges

that Local 99 picketers were present at the entrance 24 hours a day although it notified Local 99 that Dexter employees used the entrance only from 7:00 a. m. to 5:00 p. m. Monday through Friday.

On August 27, 1980 Local 99's activities allegedly became more disruptive. Amoco states that the number of picketers increased, and that they threatened physical violence against Dexter, Amoco and Web employees who entered the terminal. Furthermore, the picketers committed such "acts ... as strewing nails across the entrances to the job site, slicing tires, breaking windows, throwing rocks at persons and vehicles, [and] trespassing." They informed Amoco that they were picketing "because Amoco had hired non-union contractors and that they would continue picketing until Amoco learned to hire only union contractors."

At this point Amoco established a separate gate for Dexter and notified the picketers of this fact. Despite reservation of a separate gate for Dexter, however, Amoco alleges that Local 99 continued to picket the "neutral gate" used only by Web and Amoco employees.

On August 27, 1980 Amoco notified IBEW of Local 99's conduct and informed IBEW of Amoco's intention to file a court action. Finally, Amoco alleges that, "as a result of the ... conduct of IBEW ... [and] Local 99 ..., Amoco's employees ... [were] threatened, coerced and restrained from performing their normal tasks of employment."

---

affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.

(b) Whoever shall be injured in his business or property by reason [of] any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sus-

tained and the cost of the suit.
29 U.S.C. § 187.

6. The local unions and their members also moved to dismiss the action against them pursuant to Fed.R.Civ.P. 12(b)(5) for inadequate service of process. The Court passes this motion as moot because Amoco has re-served the defendants in compliance with Fed.R.Civ.P. 4(c), (d).

7. The Court's recitation of the factual background of this case is drawn exclusively from the allegations in the complaint.

Amoco's allegations as to Local 476 and the District Council are similar to Amoco's accusations against Local 99. On September 10, 1980 Local 476 began picketing the "neutral" employer gate. The placards carried by Local 476 picketers stated that Web "does not hire union workers." Thus, Amoco established a separate gate for Web and gave Local 476 notice of this. Like Local 99, Local 476 allegedly ignored the existence of the reserved entrance for Web and continued to picket the neutral gate. Furthermore, members of Local 476 allegedly trespassed upon Amoco's property several times and committed acts of violence and vandalism. Amoco contends that such violence was intended to induce Amoco's own employees not to report to work.

On September 11, 1980, the defendant District Council allegedly began picketing Amoco's neutral gate, despite the existence of clearly marked primary and secondary employer entrances. The members of the District Council carried placards highlighting the dispute between the Council and Web. Amoco alleges that a representative of the District Council informed Amoco that "the purpose of the picket line was to block access into and out of Amoco's plant." In addition, like Locals 99 and 476, members of the District Council allegedly entered upon Amoco's property, committing acts of violence and vandalism intended to induce Amoco's employees to breach their collective bargaining agreement with Amoco. Finally, Amoco states that it sent notice to both the Plumbers and Carpenters in Washington informing them about the conduct of their local affiliates and about Amoco's intention to sue in federal court.

Amoco's remaining allegations concern the Trades Council. The President of the Trades Council allegedly threatened Amoco that "he had seventeen...unions in the...Council and that as soon as the [NLRB]...secured an injunction against one member [union]..., the enjoined union would simply be replaced by another...." Finally, the Trades Council allegedly

threatened another Providence oil company that problems similar to Amoco's would befall it if it hired non-union contractors.

## DISCUSSION

### I. *Motion To Dismiss For Lack Of Personal Jurisdiction*

The officers of the IBEW, Plumbers and Carpenters, who are sued in both their individual and representative capacities, have moved pursuant to Fed.R.Civ.P. 12(b)(2) to dismiss the claims against them for lack of personal jurisdiction. Amoco claims that these individuals instigated, approved, or encouraged the conduct of the local unions, thereby subjecting themselves to the jurisdiction of this Court. The individuals, however, have each filed sworn affidavits stating that they were unaware of the picketing against Amoco and did not approve, encourage or instigate such conduct. They aver that they never received personal notice of the telegrams that Amoco sent to the IBEW, Carpenters and Plumbers informing them of the locals conduct. Furthermore, these affidavits uniformly state that the individuals do not reside in Rhode Island or have their principal place of business there. Except for the President and Secretary of the IBEW, each individual avers that he has not been in Rhode Island within at least the last two years.

Amoco has submitted only one affidavit in response to those of the defendants. In this affidavit, one of Amoco's attorneys states that he unsuccessfully attempted to contact the Business Manager of Local 99 on several occasions between August 26 and September 19, 1980. Amoco's attorney avers that on each occasion representatives of Local 99 informed him that the Business Manager was unavailable "because he was meeting with representatives of [the IBEW]...in Washington, D.C." Affidavit of Andrew J. Schaffran, at 2 (Nov. 24, 1981).

Viewing all the affidavits submitted[8] in the light most favorable to Amo-

---

8. A court must accept as true the allegations in a complaint for purposes of a motion to dismiss

pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim. *Miree v. DeKalb Cty.*, 433 U.S.

co, the Court finds that the individual defendants are entitled to dismissal for lack of personal jurisdiction. Their affidavits, the accuracy of which Amoco has not cast into genuine doubt[9], seem to establish the absence of "minimum contacts" with the state of Rhode Island that federal due process requires for the exercise of personal jurisdiction over a party. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980). These affidavits indicate that "the defendant[s'] conduct and connection with the forum State are [not] such that [they] should reasonably anticipate being häled into court [here]." *Id.* at 297, 100 S.Ct. at 567. The affidavit of Amoco's attorney does not reasonably contradict the defendants' sworn statements. At most, Amoco's affidavit indicates that an officer of Local 99 spoke with IBEW officials during the period of the secondary picketing. The af-

fidavit does not suggest that he spoke to any of the IBEW defendants, or that he spoke about Local 99's dispute with Amoco.

Although the officers of the national unions would thus seem entitled to immediate dismissal, the First Circuit has cautioned courts to proceed slowly when deciding jurisdictional issues. In *Surpitski v. Hughes-Keenan Corp.*, 362 F.2d 254 (1st Cir. 1966) (*per curiam*), the First Circuit reversed a district court's dismissal of a suit against a foreign corporation for lack of personal jurisdiction. The district court dismissed the suit after the plaintiff had failed to produce sufficient affidavits to contradict those of the defendant corporation within the narrow time limits that the court had set. The First Circuit held that a "plaintiff who is a total stranger to a corporation should not be required, unless he has been undiligent, to try [the]...issue [of personal jurisdiction] on affidavits without the benefit of

25, 27 n. 2, 97 S.Ct. 2490, 2492, n. 2, 53 L.Ed.2d 557 (1977); *Land v. Dollar*, 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 1010 n. 4, 91 L.Ed. 1209 (1947); *Turner v. Unification Church*, 473 F.Supp. 367, 371 (D.R.I.1978) aff'd per curiam, 602 F.2d 458 (1st Cir. 1979); *Jackson v. Sargent*, 394 F.Supp. 162, 165 n. 1 (D.Mass.), *aff'd on other grounds*, 526 F.2d 64 (1st Cir. 1975). However, when deciding a motion to dismiss for lack of personal jurisdiction, a court need not assume the plaintiff's allegations to be true. Rather, the court may consider any affidavits presented in the case and determine whether there is a factual issue as to the existence of jurisdiction. *Land v. Dollar, supra*, at 735, 735 n. 4, 67 S.Ct. at 1010, 1010 n. 4; *Attwell v. LaSalle Nat'l Bank*, 607 F.2d 1157, 1161 (5th Cir. 1979), *cert. denied*, 445 U.S. 954, 100 S.Ct. 2924, 63 L.Ed.2d 791 (1980) (personal jurisdiction); *Exchange Nat'l Bank of Chicago v. Touche, Ross & Co.*, 544 F.2d 1126, 1131 (2d Cir. 1976) (Friendly, J.) (subject matter jurisdiction); *Cervantes v. Allegheny Ludlum Indus.*, 90 F.R.D. 163, 167 (D.P.R.1981) (examining affidavits in deciding personal jurisdiction issue); *North American Video Corp. v. Leon*, 480 F.Supp. 213, 215 (D.Mass.1979) (Keeton, J.) (examining affidavits in deciding personal jurisdiction issue); *Sahatjian v. Woodlets, Inc.*, 466 F.Supp. 945, 947 (D.Mass.1979) (Caffrey, J.) (personal jurisdiction); 5 C. Wright & A. Miller, Federal Practice & Procedure § 1351, at 565–66 (1969). *See Surpitski v. Hughes-Keenan Corp.*, 362 F.2d 254, 255 (1st Cir. 1966) (*per curiam*) (personal jurisdiction). *Contra Canuel v. Oskoian*, 23 F.R.D. 307, 312–13 (D.R.I.), *aff'd on other grounds*, 269 F.2d 311 (1st Cir. 1959)

(Day, J.) (personal jurisdiction; service of process). The reason for this distinction is that dismissals for failure to state a claim are on the merits, but dismissals for lack of personal jurisdiction are not. *See Exchange Nat'l Bank of Chicago v. Touche Ross & Co., supra*, at 1130–31 (subject matter jurisdiction).

9. Motions to dismiss for failure to state a claim or for judgment on the pleadings are converted into motions for summary judgment when materials outside of the pleadings are submitted and not excluded by the Court. Fed.R.Civ.P. 12(b), (c). However, submission of affidavits in connection with a motion to dismiss for lack of personal jurisdiction do not convert the motion into one for summary judgment. Thus, the procedures associated with reviewing summary judgment motions do not apply to jurisdictional motions. *Attwell v. LaSalle Nat'l Bank*, 607 F.2d 1157, 1161 (5th Cir. 1979), *cert. denied*, 445 U.S. 954, 100 S.Ct. 2924, 63 L.Ed.2d 791 (1980) (personal jurisdiction); *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1131–32 (2d Cir. 1976) (Friendly, J.) (subject matter jurisdiction); *Kowalezyk v. Walsh*, 482 F.Supp. 959, 962 (D.Mass.1979) (McNaught, J.) (subject matter jurisdiction); *Lefkowitz v. Lider*, 443 F.Supp. 352, 354 (D.Mass.1978) (Caffrey, J.) (subject matter jurisdiction). The only relevance of Fed.R.Civ.P. 56 to motions to dismiss for lack of jurisdiction is to provide guidelines to assist the court in resolving factual disputes that arise upon submission of affidavits. *Exchange Nat'l Bank of Chicago v. Touche Ross & Co., supra*, at 1131.

full discovery." *Id.* at 255. *Accord Whittaker Corp. v. United Aircraft Corp.*, 482 F.2d 1079, 1086 (1st Cir. 1973) (reaffirming *Surpitski* and "recogniz[ing] that discovery concerning jurisdictional issues is appropriate where complex factual matters are in question and where a party has been diligent and is somewhat unfamiliar with his adversary").

Although the *Surpitski* case is factually distinguishable from Amoco's situation, this Court believes that *Surpitski* counsels allowing Amoco to conduct discovery as to the issue of personal jurisdiction over the union officers. This action is still young, and extensive discovery has likely not occurred. Furthermore, the Court has no reason to believe that Amoco has not been diligent in initiating discovery on this issue. Thus, the Court will *conditionally* dismiss the individual officers of the IBEW, Carpenters, and Plumbers for lack of personal jurisdiction. They will be dismissed unless, within ten days of the date of this opinion and order, Amoco submits to the Court a reasonably detailed plan for expeditiously conducting discovery on this issue.

II. *Motion To Dismiss For Lack Of Subject Matter Jurisdiction*

Amoco asserts federal claims against the unions and the individual defendants in this suit under 42 U.S.C. § 1985(3), 29 U.S.C. § 187, and federal common law. Amoco further claims that this Court has jurisdiction under 28 U.S.C. §§ 1331[10], 1343(a)(1)[11], 29 U.S.C. § 187(b)[12], and 28 U.S.C. § 1337[13]. The local unions and their individual members join in moving to dismiss the § 1985(3) and federal common law claims against them for lack of subject matter jurisdiction, or, alternatively, for failure to state a claim. *See* Fed.R.Civ.P. 12(b)(1), (6). The individual members alone move to dismiss the claims under 29 U.S.C. § 187 for failure to state a claim, or for lack of subject matter jurisdiction, alleging that individual union members are not liable for damages under § 187.

■ The Court finds that it does have subject matter jurisdiction over the § 1985(3) and federal common law claims against both the local unions and their individual members. These claims are not so "wholly frivolous" or "obviously insubstantial" as to deprive this Court of subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(1). *Hagans v. Lavine*, 415 U.S. 528, 537, 94 S.Ct. 1372, 1379, 39 L.Ed.2d 577 (1974); *San Juan Legal Servs., Inc. v. Legal Servs. Corp.*, 655 F.2d 434, 437 (1st Cir. 1981); *Murphy v. Inexco Oil Co.*, 611 F.2d 570, 572–73 (5th Cir. 1980). However, the question as to the damages claims under 29 U.S.C. § 187 against the individuals is much closer.

■ In *Complete Auto Transit, Inc. v. Reis*, 451 U.S. 401, 101 S.Ct. 1836, 68 L.Ed.2d 248 (1981), the Court examined the legislative history behind 29 U.S.C. § 187 in determining whether individuals could ever be sued for damages under 29 U.S.C. § 185 for breach of collective bargaining agreements. The Court stated that Congress in-

---

**10.** This statute provides:
"The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."
28 U.S.C. § 1331.

**11.** This statute provides:
The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person...[t]o recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42. ...

42 U.S.C. § 1343(a)(1).

**12.** *See* note 5 *supra.*

**13.** This jurisdictional statute provides that the "district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies."
28 U.S.C. § 1337.
Because subject matter jurisdiction over Amoco's federal claims exists under §§ 1331 and 1343(a)(1), the Court will not discuss jurisdiction under § 1337.

tended to foreclose individual damages liability in § 187. *Complete Auto Transit, Inc. v. Reis, supra,* at 1843–44. The Court then inferred from this intent behind § 187 that Congress intended to foreclose damages liability for individuals under § 185 as well. *Complete Auto Transit, Inc. v. Reis, supra,* at 1844. Although the Court's statements about § 187 in *Complete Auto* are technically dicta, they constitute a major rationale for the holding in the case. This analysis of § 187, critical to the decision in *Complete Auto,* is thus not ordinary dicta. The Court therefore finds that Amoco's claims under 29 U.S.C. § 187 have been foreclosed by the Supreme Court [14] and are too insubstantial [15] to constitute an independent basis of jurisdiction over the individual union members.[16]

### III. *Motion To Dismiss § 1985(3) Claims*

Section 2 of the Civil Rights Act of 1871, 42 U.S.C. § 1985(3) [17], creates civil liability against any persons who conspire to deprive any other person or class of persons of "the equal protection of the laws, or of equal privileges and immunities under the laws." Amoco contends that the defendants are liable under § 1985(3) for allegedly conspiring to force Amoco to cease dealing with Dexter and Web and, thus, to deprive Amoco of both its First Amendment right to associate with non-union contractors and its statutory right under 29 U.S.C. § 187 to be free of unlawful secondary activity. For

the reasons that follow, this Court finds that Amoco fails to state a claim upon which relief can be granted under 42 U.S.C. § 1985(3).

#### A. *Griffin v. Breckenridge*

*Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), the Supreme Court's most comprehensive examination of the purpose and scope of the § 1985(3) remedy [18], is the starting point for any discussion of this statute. In *Griffin,* a group of white men assaulted three blacks on a Mississippi highway in the mistaken belief that these blacks were associates of a civil rights worker. The black men brought an action under § 1985(3) to redress violations of both federal and state law, including the rights of interstate travel, free speech, and association.

The Court held that "[i]t is . . . evident that all indicators—text, companion provisions, and legislative history—point unwaveringly to § 1985(3)'s coverage of private conspiracies." *Griffin v. Breckenridge, supra,* at 101, 91 S.Ct. at 1797. Thus, the Court held that a violation of § 1985(3) does not require state action. However, the Court warned that the statute "was [not] intended to apply to all [private] tortious, conspiratorial interferences with the rights of others." *Id.* The Court feared the "constitutional shoals that would lie in the path of interpreting § 1985(3) as a general fed-

---

**14.** The Court's interpretation of § 187 in *Complete Auto* thus adopts the construction that lower courts have unanimously given the section. *See, e.g., Kerry Coal Co. v. United Mine Workers,* 637 F.2d 957, 965 (3d Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 109, 70 L.Ed.2d 95 (1981); *Universal Communications Corp. v. Burns,* 449 F.2d 691, 693 (8th Cir. 1971) (*per curiam*); *Broadmoor Homes, Northern v. Cement Masons, Local 594,* 507 F.Supp. 55, 57, 57 nn. 2–6 (N.D.Cal.1981) (collecting cases); *Bacino v. American Federation of Musicians,* 407 F.Supp. 548, 551 (N.D.Ill.1976).

**15.** Of course, the effect of this ruling is largely academic because the individuals are properly in this court under other independent bases of federal jurisdiction.

**16.** Even if the question of individual liability under § 187 is not *jurisdictionally* insubstantial, the Court would dismiss any § 187 claims

against the individual for failure to state a claim upon which relief can be granted. Indeed, even though Amoco argues that "this Court has federal question jurisdiction over the individual defendants pursuant to 29 U.S.C. § 187," Amoco's Memorandum in Opposition to Motion to Dismiss at 17, it apparently concedes that individuals may not be held liable under this section. *See id.* (not arguing the issue).

**17.** *See* note 2 *supra.*

**18.** In the more recent decision of *Great American Federal Savings & Loan Ass'n v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), the Court examined the interrelationship between § 1985(3) and Title VII, 42 U.S.C. § 2000e *et seq. See* p. 1215 *infra.*

eral tort law." *Id.* at 102, 91 S.Ct. at 1798. The Court therefore attempted to limit the § 1985(3) cause of action "by requiring . . . the kind of invidiously discriminatory motivation stressed by the sponsors of [the statute]." *Id.* The Court interpreted "[t]he language [in § 1985(3)] requiring intent to deprive of *equal* protection, or *equal* privileges and immunities . . . [to mean] that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Id.*

After making this initial decision as to the necessity of state action, the Court decided whether the statute reached the particular conduct alleged in the complaint. The Court held first that the allegations of interference with federal constitutional rights because of racial animus "li[e] so close to the coverage intended by Congress that it is hard to conceive of wholly private conduct that would come within the statute if this does not." *Id.* at 103, 91 S.Ct. at 1799. However, the Court stressed the limited nature of its holding, declining to decide "whether a conspiracy motivated by

invidiously discriminatory intent other than racial bias would be actionable under . . . § 1985(3)." *Id.* at 102 n. 9, 91 S.Ct. at 1798 n. 9.

The Court next inquired as to "a source of congressional power to reach the private conspiracy alleged." *Id.* at 104, 91 S.Ct. at 1799. The Court held that the Thirteenth Amendment and the constitutional right to interstate travel, which are both assertable against private as well as state interference, supplied the source of Congressional power in the case. *Id.* at 104–07, 91 S.Ct. at 1799–1801.

B. *§ 1985(3) As A Remedy For Violations Of Amoco's First Amendment Rights*

 Although this Court has grave doubts that Amoco's complaint alleges the sort of invidious, class-based animus that *Griffin* requires, the Court will assume that the defendants' alleged actions against Amoco because of its employment practices is both class-based [19] and invidious [20]. However, the Court finds nonetheless that Amoco is not entitled to relief under § 1985(3)

**19.** Courts have interpreted *Griffin* as requiring "class-based" animus, and excluding purely personal disputes from the scope of § 1985(3). *E.g., Silkwood v. Kerr-McGee Corp.,* 637 F.2d 743, 748 (10th Cir. 1980), *cert. denied,* — U.S. ——, 102 S.Ct. 132, 70 L.Ed.2d 111 (1981); *Downs v. Sawtelle,* 574 F.2d 1, 16 (1st Cir.), *cert. denied,* 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 255 (1978); *Arnold v. Tiffany,* 487 F.2d 216, 218 (4th Cir. 1973), *cert. denied,* 415 U.S. 984, 94 S.Ct. 1578, 39 L.Ed.2d 881 (1974); *Weiss v. Patrick,* 453 F.Supp. 717, 723–24 (D.R.I.), *aff'd without opinion,* 588 F.2d 818 (1978), *cert. denied,* 442 U.S. 929, 99 S.Ct. 2858, 61 L.Ed.2d 296 (1979). Defendants contend that Amoco's § 1985(3) claims should be dismissed because the complaint does not sufficiently allege class-based discrimination. At most, contend defendants, the complaint reveals a private dispute between one employer and some disgruntled unions. Amoco argues, however, that it has alleged the requisite animus; it contends that the dispute was between unions and the class of employers who choose to associate with non-union contractors. Because the Court need not resolve this issue, it notes only that there is caselaw to support each position. *Compare, e.g., Silkwood v. Kerr-McGee Corp., supra,* at 748 (no class-based animus where conspiracy to prevent employees from joining

labor union alleged); *Arnold v. Tiffany, supra,* at 218 (no class-based animus where conspiracy against class of newspaper dealers alleged); *City of Winston-Salem v. Teamsters Local Union No. 391,* 470 F.Supp. 442, 448 (N.D.N.C. 1979) (no class-based animus where complaint alleged conspiracy against class of persons refusing to join labor union) *with Kimble v. D. J. McDuffy, Inc.,* 648 F.2d 340, 347 (5th Cir.), *cert. denied,* — U.S. ——, 102 S.Ct. 687, 70 L.Ed.2d 651 (1981) (§ 1985(3) envisions "class based on political beliefs or associations"); *Scott v. Moore,* 640 F.2d 708, 718, 723 (5th Cir.), *scheduled for rehearing en banc,* 656 F.2d 108 (5th Cir. 1981) (class-based animus exists where conspiracy by unions to injure non-union employer and employees alleged); *Cameron v. Brock,* 473 F.2d 608, 610 (6th Cir. 1973) (§ 1985(3) reaches "clearly defined classes, such as supporters of a political candidate"). *See* generally *Hampton v. Hanrahan,* 600 F.2d 600, 623 n. 22 (7th Cir. 1979), *rev'd,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980) (citing cases involving § 1985(3) claims of discrimination based on political beliefs or affiliations).

**20.** In *Griffin,* the Court expressly left open the possibility that a "conspiracy motivated by invidiously discriminatory intent other than ra-

cial bias would be actionable under...§ 1985(3)." *Griffin v. Breckenridge*, 403 U.S. 88, 102 n. 9, 91 S.Ct. 1790, 1798 n. 9, 29 L.Ed.2d 338 (1971). Courts since *Griffin* have thus struggled with the question of what types of class-based animus Congress intended § 1985(3) to encompass. *See, e.g., Ward v. Connor*, 657 F.2d 45, 48 (4th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1253, 71 L.Ed.2d 445 (1982) (discrimination because of one's religion actionable under § 1985(3)); *Scott v. Moore*, 640 F.2d 708, 719–23 (5th Cir.), *scheduled for rehearing en banc*, 656 F.2d 108 (5th Cir. 1981) (discrimination because of employer's non-union status actionable); *Brett v. Sohio Construction Co.*, 518 F.Supp. 698, 705 (D.Alaska 1981) (discrimination against union members because of exercise of statutory free speech rights actionable); *Amalgamated Clothing & Textile Workers Union v. J. P. Stevens & Co.*, 475 F.Supp. 482, 491–92 (S.D.N.Y.1979), *vacated as moot*, 638 F.2d 7 (2d Cir. 1980) (conspiracy to oppress those affiliated with union not actionable); *Turner v. Unification Church*, 473 F.Supp. 367, 373 (D.R.I.1978), *aff'd per curiam*, 602 F.2d 458 (1st Cir. 1979) (discrimination because of one's religion actionable); *Curran v. Portland Superintending School Committee*, 435 F.Supp. 1063, 1085 (D.Me. 1977) (discrimination because of one's sex actionable); *Moshlak v. American Broadcasting Co.*, 423 F.Supp. 774, 778 (S.D.N.Y.1976) (conspiracy to deprive union of rights not actionable).

Because *Griffin* left ambiguous the sorts of class-based discrimination actionable under § 1985(3), courts have devised tests to determine the classes that can seek relief under the statute. Some courts limit relief to those traditionally disadvantaged classes qualifying as "discrete and insular minorities." *E.g., Orshan v. Anker*, 489 F.Supp. 820, 823 (E.D.N.Y.1980); *DeLuca v. Sullivan*, 450 F.Supp. 736, 739 (D.Mass.1977). *See Carchman v. Korman Corp.*, 594 F.2d 354, 356 (3d Cir.), *cert. denied*, 444 U.S. 898, 100 S.Ct. 205, 62 L.Ed.2d 133 (1979) (§ 1985(3) available both to "victims of historically pervasive discrimination" and those with "immutable characteristics for which [they] have no responsibility"); *Bricker v. Crane*, 468 F.2d 1228, 1233 (1st Cir. 1972), *cert. denied*, 410 U.S. 930, 93 S.Ct. 1368, 35 L.Ed.2d 592 (1973) (no § 1985(3) claim where plaintiff asserted membership in a "novel class which is neither readily cognizable nor among those traditionally protected by the Civil Rights Act"). Other courts would place a straight-jacket around § 1985(3), limiting relief to classes of persons with immutable characteristics for which they have no responsibility. *E.g., Savina v. Gebhart*, 497 F.Supp. 65, 68 (D.Md.1980); *Wagar v. Hasenkrug*, 486 F.Supp. 47, 50 (D.Mont.1980). At least one court allows § 1985(3) relief for any class of persons who join together for the purpose of

exercising certain fundamental rights in "a unique way." *Browder v. Tipton*, 630 F.2d 1149, 1152–53 (6th Cir. 1980). Finally, the Ninth Circuit has extended § 1985(3) to groups that Congress, through other federal legislation, has determined "warrant special federal assistance in protecting their civil rights." *DeSantis v. Pacific Telephone & Telegraph Co.*, 608 F.2d 327, 333 (9th Cir. 1979). *Accord Lapin v. Taylor*, 475 F.Supp. 446, 449 (D.Hawaii 1979) (following *DeSantis* and finding federal "whistle blowers" protected class under § 1985(3) because protected by another federal statute).

Although this Court need not decide whether discrimination against the class of those who associate with non-union contractors is actionable under § 1985(3), the Court strongly suspects that it is not. Section 1985(3) was enacted principally to provide redress to victims of the Ku Klux Klan's acts of terror in the Reconstruction South. *Scott v. Moore, supra*, at 715; Comment, *A Construction of Section 1985(c) in Light of Its Original Purpose*, 46 U.Chi.L.Rev. ·402, 404–05 (1979). *See, e.g.*, 98 Cong. Globe 153 (1871) (remarks of S. Sherman); *id.* at 198–200 (remarks of S. Ames). According to the proponents of the legislation that became § 1985(3), the victims of this terror were chiefly blacks and members of the Republican party, which was associated with Reconstruction, emancipation of the slaves, and the Civil War amendments to the Constitution. *See id.* at 157 (remarks of S. Sherman); *id.* at 320–21 (remarks of Rep. Shellabarger); *id.* at 391 (remarks of Rep. Elliott); *id.* at 487 (remarks of Rep. Tyner). *See generally* Comment, *supra*, at 407–11. Furthermore, the proponents of the legislation believed that the states were either unwilling or unable to protect these victimized classes, and that these classes were thus politically and socially helpless. *See* 98 Cong. Globe 158 (1871) (remarks of Rep. Shellabarger); *id.* at 198 (remarks of S. Ames); *id.* at 200–01 (remarks of S. Nye); *id.* at 321 (remarks of Rep. Shellabarger); *id.* at 339 (remarks of Rep. Kelley); *id.* at 368 (remarks of Rep. Sheldon); *id.* at 487 (remarks of Rep. Tyner and Rep. Lansing).

In light of this legislative history, the Court concludes that the conduct alleged in Amoco's complaint likely does not satisfy *Griffin's* requirement of "invidious" discrimination. *Griffin v. Breckenridge, supra*, 403 U.S. at 102, 91 S.Ct. at 1798. *Contra Scott v. Moore, supra*, at 721–23. In order for a plaintiff to obtain relief under § 1985(3), it seems that he must belong to a class whose status approaches that of a "discrete and insular minority" or a "historically disadvantaged group." In short, the plaintiff must be part of a group that, like blacks and Republicans in the Reconstruction South, is so socially and politically weak that it cannot effectively protect and enjoy its civil rights. *See Arnold v. Tiffany, supra*, at 1036 ("invidious" discrimination does not include conspiracy against newspaper dealers' trade association).

for alleged violations of its First Amendment rights because of the absence of state action.

Although *Griffin* held that § 1985(3) reaches both private and state conduct, the Court did not squarely decide whether Congress intended the statute to provide a new cause of action for redress of purely private interferences with rights traditionally assertable only against the state[21]. Indeed, it was unnecessary to resolve this issue in *Griffin* because constitutional rights assertable against private parties were involved. Thus, lower courts after *Griffin* have held that state action is still relevant to a § 1985(3) claim, distinguishing between the *conduct* that the statute may reach and the *rights* that may be violated by particular conduct. *E.g., Doski v. M. Goldseker Co.,* 539 F.2d 1326, 1333–34, 1334 n. 13 (4th Cir. 1976); *Cohen v. Illinois Institute of Technology,* 524 F.2d 818, 829, 829 nn. 30–32 (7th Cir. 1975) (Stevens, J.), *cert. denied,* 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976); *Bellamy v. Mason's Stores, Inc.,* 508 F.2d 504, 506–07 (4th Cir. 1974); *Williams v. Northfield Mt. Hermon School,* 504 F.Supp. 1319, 1329–30 (D.Mass.1981); *Levitch v. CBS, Inc.,* 495 F.Supp. 649, 659–60 (S.D.N.Y.1980). *See Bricker v. Crane,* 468 F.2d 1228, 1233 (1st Cir. 1972), *cert. denied,* 410 U.S. 930, 93 S.Ct. 1368, 35 L.Ed.2d 592 (1973) (declining to decide whether state action requirement survives *Griffin* when predicate constitutional right arises under Fourteenth Amendment). *See generally Lopez v. Arrowhead Ranches,* 523 F.2d 924, 927 n. 3 (9th Cir. 1975) (collecting cases).

▇▇ The Supreme Court answered this issue left open in *Griffin* in *Great American Federal Savings & Loan Ass'n v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). In *Novotny,* the plaintiff attempted to remedy a violation of his rights under Title VII, 42 U.S.C. § 2000e *et seq.,* through § 1985(3). In deciding that § 1985(3) was unavailable for violations of Title VII, the Court stressed that § 1985(3) "provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates." *Id.* at 372, 99 S.Ct. at 2349. "Section 1985(3)... [merely] provid[es] a civil cause of action when some *otherwise defined federal right*—to equal protection of the laws or equal privileges and immunities under the laws—is breached...." *Id.* at 376, 99 S.Ct. at 2351 (emphasis added). Thus, *Novotny* can only mean that § 1985(3) provides no remedy for alleged violations of constitutional rights traditionally assertable against the state unless state action is involved. *Williams v. Northfield Mt. Hermon School, supra,* at 1330 n. 13; *Levitch v. CBS, Inc., supra,* at 659–60. *But see, e.g., Scott v. Moore,* 640 F.2d 708, 723–26 (5th Cir.), *scheduled for rehearing en banc,* 656 F.2d 108 (5th Cir. 1981) (without discussing *Novotny,* finding § 1985(3) reaches private interferences with First Amendment associational rights); *Tomei v. Finley,* 518 F.Supp. 241, 243 (N.D.Ill.1981) (without discussing *Novotny,* finding that § 1985(3) reaches private interferences with First Amendment associational rights). To hold otherwise would be to interpret § 1985(3) as creating a new substantive cause of action, thus contravening the clear language of *Novotny.*

▇▇ In the present case, Amoco has alleged that the defendants violated its First Amendment right to associate freely with non-union contractors.[22] However, it

---

**21.** However, *Griffin* contains dicta suggesting that the Court *did* construe § 1985(3) as providing a remedy for private interference with *any* constitutional rights. The Court stated:

A century of Fourteenth Amendment adjudication has, in other words, made it understandably difficult to conceive of what might constitute a deprivation of the equal protection of the laws by private persons. Yet there is nothing inherent in the phrase that requires the action working the deprivation to come from the State.... Indeed, the fail-

ure to mention any such requisite can be viewed as an important indication of congressional intent to speak in § 1985(3) of all deprivations of "equal protection of the laws" and "equal privileges and immunities under the laws," whatever their source. 403 U.S. at 97 [91 S.Ct. at 1796.]

**22.** The Court need not decide whether Amoco has First Amendment associational rights. However, it is clear that corporations *do* have rights under the due process and equal protec-

is well-settled that First Amendment rights are limitations upon state action only, not upon private conduct. *Gilmore v. City of Montgomery*, 417 U.S. 556, 575, 94 S.Ct. 2416, 2427, 41 L.Ed.2d 304 (1974) (freedom of association); *CBS, Inc. v. Democratic Nat'l Committee*, 412 U.S. 94, 114, 93 S.Ct. 2080, 2092, 36 L.Ed.2d 772 (1973) (freedom of speech, press); *Cape Cod Nursing Home Council, Inc. v. Rambling Rose Rest Home*, 667 F.2d 238 at 240 (1st Cir. 1981) (freedom of access); *Levitch v. CBS, Inc., supra,* at 656 (freedom of speech, press). Because Amoco's complaint does not allege that state action was involved in this case, the Court finds that the complaint fails to state a claim for redress of First Amendment violations through § 1985(3).

### C. Motion To Dismiss Claim For Redress Of Statutory Violations Under § 1985(3)

Amoco claims redress under § 1985(3) for the defendants' alleged violations of its right under 29 U.S.C. §§ 158(b)(4)(B), 187 "to be free from unlawful secondary boycotts and picketing by labor organizations and their individual agents." *Amoco's Memorandum in Opposition to Motion to Dismiss* at 10. Even assuming, however, that § 1985(3) provides a remedy for violations of federal *statutory* rights[23], the Court must dismiss this claim because of the Supreme Court's decisions in *Great American Federal Savings & Loan Ass'n v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), and *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981).

In *Novotny*, the plaintiff brought a § 1985(3) action to redress alleged violations of his employment rights under Title VII, 42 U.S.C. § 2000e *et seq.* Without discussing whether § 1985(3) could ever be used to remedy violations of statutory rights, the Court held that § 1985(3) was unavailable as a remedy for Title VII violations. The Court reasoned that Congress had created a "comprehensive" remedial scheme within Title VII itself for violations of the statute. *Id.* at 373, 99 S.Ct. at 2349. "Under Title VII," the Court explained, "cases of alleged employment discrimination are subject to a detailed administrative and judicial process designed to provide an opportunity for nonjudicial and nonadversary resolution of claims." *Id.* at 372–73, 99 S.Ct. at 2349. The Court noted that a plaintiff could circumvent these detailed requirements were a § 1985(3) remedy available. *Id.* at 375, 99 S.Ct. at 2350. Were § 1985(3) relief available, a plaintiff could avoid exhaustion of the administrative remedies required by Title VII, obtain a jury trial and possibly punitive damages, both of which Title VII does not allow, and ignore Title VII's time limitations as to the filing of a complaint. *Id.* at 375–76, 99 S.Ct. at 2350–51.

In *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), the Court used similar reasoning in holding that 42 U.S.C. § 1983 does not provide a remedy for violations of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* [hereinafter "FWPCA"], and the Marine

---

tion clauses of the Fourteenth Amendment and are thus "persons" entitled to enforce those rights under § 1985(3). *See Des Vergnes v. Seekonk Water District*, 601 F.2d 9, 16 (1st Cir. 1979) (corporation has constitutional rights entitled to protection under 42 U.S.C. § 1983); *Mother Goose Nursery Schools v. Sendak*, 502 F.Supp. 1319, 1324 (N.D.Ind.1980) (corporation can sue for deprivation of its constitutional rights); *Gentry v. Howard*, 365 F.Supp. 567, 572 (W.D.La.1973) (corporations have rights to due process and equal protection); *Llano del Rio Co. of Nevada v. Anderson-Post Hardwood Lumber Co.*, 79 F.Supp. 382, 392 (W.D.La. 1948), *aff'd*, 187 F.2d 235 (5th Cir. 1951) (cor-

poration has rights to equal protection and due process enforceable through § 1985(3)); 42 U.S.C. § 1985(3) (giving right of action to "person" deprived of equal protection of laws or equal privileges and immunities under the laws).

**23.** *Contra Great American Federal Savings & Loan Ass'n v. Novotny*, 442 U.S. 366, 379, 99 S.Ct. 2345, 2352, 60 L.Ed.2d 957 (1979) (concurring opinion, Powell J.) (§ 1985(3) not intended to provide a remedy for the violation of statutory rights); *id.* at 385, 99 S.Ct. at 2355 (concurring opinion, Stevens, J.) (same).

Protection, Research, and Sanctuaries Act of 1972, 33 U.S.C. § 1401 *et seq.* [hereinafter "MPRSA"]. The Court noted first that the MPRSA and FWPCA "provide quite comprehensive enforcement mechanisms." *Id.* at 20, 101 S.Ct. at 2626, 69 L.Ed.2d at 451. Each statute expressly confers authority on both private citizens and governmental officials to sue to enforce the statutes. *Id.* at 12, 101 S.Ct. at 2622, 69 L.Ed.2d at 446. In addition, the Administrator of the Environmental Protection Agency is empowered to seek both civil and criminal penalties for violations of these statutes. *Id.*

Because the MPRSA and FWPCA contain "sufficiently comprehensive" remedial devices, the Court held that they "demonstrate congressional intent to preclude the remedy of suits under § 1983." *Id.* at 20, 101 S.Ct. at 2626, 69 L.Ed.2d at 450. "It is hard to believe," the Court remarked, "that Congress intended to preserve the § 1983 right of action when it created so many specific statutory remedies including...citizen-suit provisions." *Id.* at 20, 101 S.Ct. at 2626, 69 L.Ed.2d at 451.

■ *Novotny* and *Sea Clammers* require this Court to hold that Congress did not intend § 1985(3) to provide a remedy for violations of 29 U.S.C. §§ 158(b)(4)(B), 187. *Browder v. Tipton*, 630 F.2d 1149, 1151 n. 3 (6th Cir. 1980) (dicta). Congress provided a comprehensive remedy in 29 U.S.C. § 187 for damage incurred by the unlawful secondary activity proscribed in § 158(b)(4)(B). Section 187, which encompasses both peaceful and violent secondary picketing[24], provides a right of action for compensatory damages[25] against labor organizations[26] that picket one employer in order to induce it to cease dealing with another employer.

This express and "sufficiently comprehensive" statutory remedy "demonstrate[s] congressional intent to preclude the remedy of" § 1985(3). *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n, supra,* at 20, 101 S.Ct. at 2626, 69 L.Ed.2d at 450. Furthermore, were a § 1985(3) remedy available for violations of § 158(b)(4)(B), a plaintiff would be able to circumvent the limitations on the relief available under § 187. *See Great American Federal Savings & Loan Ass'n v. Novotny, supra,* at 375–76, 99 S.Ct. at 2350–51. For example, although 29 U.S.C. § 187 does not provide punitive damages for peaceful secondary picketing[27], punitive damages might be available for certain peaceful picketing under § 1985(3). Furthermore, a plaintiff might be able to collect damages from individual union members under § 1985(3) for participation in unlawful secondary picketing. However, individuals are not subject to suit for damages under § 187[28]. In addition, attorney's fees are "not expressly authorized" under § 187, and "the only basis for awarding...fees would be upon a showing that the Union acted in 'bad faith, vexatiously, wantonly, or for oppressive reasons.'" *F. F. Instrument Corp. v. Union de Tronquistas de Puerto Rico,* 558 F.2d 607, 609 n. 2, 609–10 (1st Cir. 1977). However, attorneys' fees would be readily available under 42 U.S.C. §§ 1985(3) and 1988[29], and "a successful plaintiff should ordinarily recover [fees]...unless special circumstances would render such an award unjust." *David v. Travisono,* 621 F.2d 464, 468 (1st Cir. 1980). In short, the comprehensiveness of the remedy under § 187 and the inconsistencies that would arise between remedies under § 187 and § 1985(3) for unlawful secondary activity convince this Court

24. Actually, 29 U.S.C. § 187(a) incorporates the secondary conduct provisions of 29 U.S.C. § 158(b)(4).

25. See p. 1224 *infra.*

26. *See* note 14 and accompanying text *supra.*

27. *United Mine Workers v. Gibbs,* 383 U.S. 715, 728, 86 S.Ct. 1130, 1140, 16 L.Ed.2d 218 (1966); *Local 20, Teamsters Union v. Morton,* 377 U.S. 252, 260, 84 S.Ct. 1253, 1258, 12 L.Ed.2d 280 (1964); p. 1224 *infra.*

28. *See* note 14 and accompanying text supra.

29. This statute provides in relevant part: "In any action or proceeding to enforce a provision of [42 U.S.C. §§ 1981–82, 1985, or 1986] ..., the court, in its discretion, may allow the prevailing party...a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988.

that Congress has foreclosed § 1985(3) relief in this case.

## IV. Motion To Dismiss Federal Common Law Claim

Amoco alleges that defendants, through acts and threats of violence, encouraged and induced Amoco's own employees to refuse to perform their employment services for Amoco and to strike, thereby breaching their collective bargaining agreement with it. Amoco's complaint, allegation 100, at 21; Amoco's Memorandum in Opposition to Motion to Dismiss at 15–16. Amoco further alleges that the objective of this conduct was to force Amoco to cease doing business with Dexter and Web. Complaint, allegation 101, at 21. Finally, Amoco argues that the defendants' conduct gives rise to a federal common law remedy against both the unions and their individual members for tortious interference with a labor contract. However, the Court finds this claim unmeritorious because the National Labor Relations Act has "occupied the field."

It is apparent that Amoco has merely restated its statutory secondary picketing claim under the rubric of "federal common law." The alleged conduct for which Amoco requests the Court to fashion a novel common law remedy is already comprehensively dealt with under 29 U.S.C. § 158(b)(4)(B). A labor organization which has a labor dispute with one employer violates this section by inducing or encouraging the employees of another employer, whether by peaceful picketing or by threats of violence, *Clark Engineering & Construction Co. v. United Brotherhood of Carpenters & Joiners, Four Rivers District Council*, 510 F.2d 1075, 1080–81 (6th Cir. 1975); *see IBEW v. NLRB*, 341 U.S. 694, 701–02, 71 S.Ct. 954, 958–59, 95 L.Ed. 1299 (1951), to refuse to perform any employment services for the second employer, *NLRB v. Servette, Inc.*, 377 U.S. 46, 50 n. 4, 52–53, 54, 84 S.Ct. 1098, 1101 n. 4, 1102–1103, 1103, 12 L.Ed.2d 121 (1964); *Allied International, Inc. v. International Longshoremen's Ass'n*, 640 F.2d 1368, 1374 (1st Cir.), *cert. granted*, —— U.S. ——, 102 S.Ct. 90, 70 L.Ed.2d 83 (1981); *Texas Distributors, Inc. v. Local No. 100, United Ass'n of Journeymen and Apprentices of the Plumbing and Pipefitting Industry*, 598 F.2d 393, 398 (5th Cir. 1979); *NLRB v. Laborers Int'l Union, Local 676*, 575 F.2d 1255, 1256 (8th Cir. 1978) (*per curiam*); *Vulcan Materials Co. v. United Steel Workers of America*, 430 F.2d 446, 455–56 (5th Cir. 1970), *cert. denied*, 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247 (1971), if the union's objective is to force the second employer to cease doing business with the first. 29 U.S.C. § 158(b)(4)(i)(B). Furthermore, 29 U.S.C. § 187(a) creates a cause of action for compensatory damages against the offending labor organization.

Because Amoco's "federal common law" allegations are actually governed by 29 U.S.C. §§ 158(b)(4)(i)(B), 187(a) [30], this Court refuses to create any federal common law remedy.[31] Congress comprehensively

---

**30.** Amoco, however, apparently contends that its federal common law claims arise under 29 U.S.C. § 185(a), which the Court in *Textile Workers' Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), interpreted as a broad congressional mandate to the courts to create federal common law regulating collective bargaining agreements. *See* Amoco's Memorandum in Opposition to Motion to Dismiss at 16.

**31.** This case involves allegations of secondary conduct at a common situs at which both the primary and secondary employers conducted business. "Common situs" cases pose special problems for courts. The difficult task of differentiating protected primary activity with incidental effects on a secondary employer from proscribed secondary conduct becomes even more difficult when the primary and secondary employers share the same work site. The Court wishes to alert the parties to the delicate legal and factual problems that common situs activity presents and directs them to consider these problems in future litigation of this case. *See generally NLRB v. Local 825, Int'l Union of Operating Engineers*, 400 U.S. 297, 303, 91 S.Ct. 402, 406, 27 L.Ed.2d 398 (1971) (primary activity protected even though seriously affects neutral third parties); *Local 761, Int'l Union of Electrical, Radio, & Machine Workers v. NLRB*, 366 U.S. 667, 673–74, 81 S.Ct. 1285, 1289–90, 6 L.Ed.2d 592 (1961) (no "glaringly bright line" between primary and secondary picketing in common situs cases); *NLRB v. Local 58, IBEW*, 638 F.2d 36, 37 (6th Cir. 1981) (*per*

regulated secondary activity in § 158(b)(4)(B), proscribing inducement— whether by violence or peaceful means—of a secondary employer's employees to cease working for him. Moreover, Congress created a sufficiently comprehensive remedy in § 187(a). This Court thus holds that Congress has foreclosed federal common law as a remedy for already comprehensively regulated unlawful secondary conduct.[32] *See Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. at 1, 101 S.Ct. at 2627, 69 L.Ed.2d at 451–52 (comprehensive regulatory scheme in FWPCA and MPRSA "pre-empt" federal common law of nuisance in area of water pollution); *Allied International, Inc. v. International Longshoremen's Ass'n*, 640 F.2d 1368, 1381 (1st Cir.) *cert. granted*, —— U.S. ——, 102 S.Ct. 90, 70 L.Ed.2d 83 (1981) (finding no federal common law remedy based on *purely peaceful* secondary activity because "in enacting [§ 187] Congress meant to supersede any federal common law that might upset the balance...between the rights of management and labor"). Furthermore, were this Court to create a federal common law remedy, as Amoco requests, for the *individual* defendants' *violent* secondary acts, the Court would contravene the Supreme Court's in-

terpretation of § 187 as immunizing individual union members from federal damages liability. *Complete Auto Transit, Inc. v. Reis*, 101 S.Ct. at 1843–44.

### V. Motion To Dismiss Pendent Claims

The individual members of Local 476, Local 99, the District Council and the Trades Council whom Amoco has sued move to dismiss all of Amoco's pendent state law claims against them. They argue that the Court should not exercise pendent jurisdiction in this case. Furthermore, the local unions are also apparently moving that the Court not take pendent jurisdiction over the punitive damages claim [33] against them. However, the Court finds that it has both constitutional and statutory power to exercise jurisdiction over all pendent claims in this suit.[34] Moreover, the Court concludes that it should exercise this jurisdiction in the interests of judicial economy, fairness, and uniform application of the federal labor laws. The Court's analysis must begin with a survey of the Supreme Court's three most important decisions on pendent jurisdiction: *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276

*curiam*) (§ 158(b)(4)(B) violation where union failed to restrict picketing to gate reserved for primary at common situs); *Allied Concrete, Inc. v. NLRB*, 607 F.2d 827, 831 (9th Cir. 1979) (§ 158(b)(4)(B) violation where union failed to restrict picketing to gate reserved for primary at common situs); *NLRB v. IBEW*, 574 F.2d 1302, 1304 (5th Cir. 1978) (§ 158(b)(4)(B) violation where union failed to restrict picketing to gate reserved for primary at common situs).

**32.** Defendants refer this Court to the Third Circuit's recent decision in *Wilkes-Barre Publishing Co. v. Newspaper Guild of Wilkes-Barre, Local 120*, 647 F.2d 372 (3d Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1003, 295 L.Ed.2d 71 (1982), in which the court created a federal common law remedy for tortious interference with a collective bargaining agreement. *Id.* at 381. This case, however, is inapposite because it did not involve allegations of unlawful secondary activity, as does Amoco's. Thus, 29 U.S.C. § 187 had not "occupied the field" in which federal common law was allowed to operate in *Wilkes-Barre*.

**33.** See Memorandum in Support of Motion to Dismiss the Amended Complaint Against the Local Unions and their Officers at 7–8.

**34.** Had Amoco not sued the national unions, whose presence in this action destroys complete diversity, it could have brought its state law claims against the local unions and their members under diversity jurisdiction. At least one national union officer whom Amoco has sued in this action resides in the same state in which Amoco is incorporated. See affidavit of Martin J. Ward, President of Plumbers, at 1 (Oct. 27, 1981). Because a union's citizenship is the same as that of all its members, *United Steelworkers v. R. H. Bouligny, Inc.*, 382 U.S. 145, 150–53, 86 S.Ct. 272, 274–76, 15 L.Ed.2d 217 (1965); *Local No. 1 (ACA) Broadcast Employees of the Int'l Brotherhood of Teamsters v. International Brotherhood of Teamsters*, 614 F.2d 846, 853 (3d Cir. 1980), there is no complete diversity in this action. *See Hanson v. Chicago, Burlington, & Quincy R. R. Co.*, 282 F.2d 758, 760 (7th Cir. 1960), *cert. denied*, 365 U.S. 850, 81 S.Ct. 813, 5 L.Ed.2d 814 (1961) ("members" of union include its officers).

(1976); and *Owen Equipment and Erection Co. v. Kroger*, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978).

In *United Mine Workers v. Gibbs*, the plaintiff brought claims against a union under both 29 U.S.C. § 187 and state law. The Court held that it had subject matter jurisdiction over the federal claim, but lacked independent federal jurisdiction over the pendent state claim. The Court held, however, that *"pendent claim"* jurisdiction could be exercised over the state claims. The Court held that power, under Article III of the Constitution, to exercise pendent jurisdiction exists when: (1) there is a substantial federal question in the case over which the court has subject matter jurisdiction; and (2) the state and federal claims "derive from a common nucleus of operative fact" such that the plaintiff "would ordinarily be expected to try them all in one" action. 383 U.S. at 725, 86 S.Ct. at 1138. The Court in *Gibbs* then held that, if a court has power to exercise jurisdiction, it must next decide whether, in its discretion, to do so. The Court stated that considerations of judicial economy, convenience, fairness, chance of jury confusion, and federal-state comity should guide a court's decision. *Id.* at 726–27, 86 S.Ct. at 1139.

The Court next spoke on pendent jurisdiction in *Aldinger v. Howard*. In *Aldinger*, the plaintiff brought suit against a municipality and certain county officials under 42 U.S.C. § 1983 and a pendent state law claim. Because the Supreme Court's precedents then held that a municipality could not be sued under § 1983, the Court ruled that no independent federal basis of jurisdiction over the municipality existed. Thus, unlike the defendant in *Gibbs*, the municipality was a "pendent party."

The Court distinguished the situation in *Aldinger* from that in *Gibbs*, where independent federal question jurisdiction existed over the party who was also being sued under state law. *Aldinger v. Howard*, 427 U.S. at 14–16, 96 S.Ct. at 2420–2421. The Court explained further that in *Gibbs* "Congress was silent on the extent to which the defendant, already properly in federal court

under a statute, might be called upon to answer nonfederal...claims; the way was thus left open for the Court to fashion its own rules under...Art. III." *Id.* at 15, 96 S.Ct. at 2420. However, where a plaintiff attempts to sue a party, over whom there is no independent basis of jurisdiction, on state law claims, the question of whether pendent jurisdiction may be exercised "must be decided, not in the context of congressional silence..., but in quite the opposite context." *Id.* at 15–16, 96 S.Ct. at 2420–2421. The issue, thus, was whether Congress in its jurisdictional statutes had "addressed itself to the *party* as to whom [pendent] jurisdiction...is sought." *Id.* at 16, 96 S.Ct. at 2421. A court must therefore determine whether a particular federal jurisdictional statute "expressly or by implication negate[s] [the] existence" of pendent jurisdiction. *Id.* at 18, 96 S.Ct. at 2422.

The Court concluded in *Aldinger* that Congress *had* negated pendent jurisdiction over the municipality under 28 U.S.C. § 1343(a)(3), the jurisdictional statute involved. The Court reasoned that Congress' exclusion of municipalities from liability under 42 U.S.C. § 1983 implied an intent to exclude them from suit in federal court on pendent claims as well. *Id.* at 17, 96 S.Ct. at 2421.

The third case in this trilogy is *Owen Equipment and Erection Co. v. Kroger*. In *Kroger*, the original defendant in a diversity action impleaded a third party defendant having the same citizenship as the plaintiff. The plaintiff then filed a third party state law claim against the impleaded party. Although there was an independent basis for exercising federal jurisdiction over the original defendant's third party claim, none existed over the plaintiff's. The Court held that it lacked jurisdiction over the plaintiff's third party claim.

The Court began its analysis by noting that "*Gibbs* and this case are two species of the same generic problem: Under what circumstances may a federal court hear and decide a state-law claim...." 437 U.S. at 370, 98 S.Ct. at 2400. The Court explained, however, that "[i]t is apparent that *Gibbs*

delineated the constitutional limits of federal judicial power.... Constitutional power is merely the first hurdle that must be overcome in determining that a federal court has jurisdiction over a...controversy." *Id.* at 371–72, 98 S.Ct. at 2401–02. As in *Aldinger*, a court must ask additionally whether "the specific statute that confers jurisdiction over the federal claim [in a case] '...expressly or by implication [has] negated' the exercise of jurisdiction over the...nonfederal claim." *Id.* at 373, 98 S.Ct. at 2402 (quoting *Aldinger v. Howard, supra,* at 18, 96 S.Ct. at 2422).

As in *Aldinger*, the Court in *Kroger* found that Congress had negated the existence of jurisdiction over the state claim at issue. The Court reasoned that the congressional requirement of complete diversity under 28 U.S.C. § 1332, which was the basis for jurisdiction in the case, would be contravened if a plaintiff could sue a nondiverse third-party defendant on a state law claim.

Although *Aldinger* suggests that examination of congressional intent is restricted to *pendent party* situations, the broad language in *Kroger* dispels this suggestion. The Court in *Kroger* looked to the congressional intent underlying the jurisdictional statute at issue *without* first characterizing the case as involving pendent claims (the *Gibbs* situation) or pendent parties (the *Aldinger* situation). Thus, whenever a court is asked to exercise pendent jurisdiction, whether over pendent *claims* (where the party sued under state law is in court subject to an independent basis of federal jurisdiction), *or* over pendent *parties* (where no such independent basis exists), a court must consider three questions. First, is there constitutional power under Article III to exercise pendent jurisdiction? Second, has Congress expressly or implicitly negated such power? Third, should the court exercise its discretion to use such power? *Hoover v. Franzen,* 669 F.2d 433 (7th Cir. 1982) (in habeas corpus action asserting federal constitutional and pendent state law claims against same defendant, holding that *Aldinger/Owen* examination

of congressional intent as well as *Gibbs* analysis of Article III power necessary in both pendent party cases and pendent claim actions, such as the habeas case before court). *See* Comment, *Aldinger v. Howard and Pendent Jurisdiction,* 77 Colum.L.Rev. 127, 147–48 (1977) (*Aldinger* "might well" require examination of congressional intent in all pendent jurisdiction cases). *Contra Gagliardi v. Flint,* 564 F.2d 112, 115 n. 2 (3d Cir. 1977), *cert. denied,* 434 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978) (*Aldinger* "does not speak" to situation where independent basis of jurisdiction exists over municipality against whom pendent state claims asserted).

Indeed, although somewhat unclear, the First Circuit's decision in *Ortiz v. United States,* 595 F.2d 65 (1st Cir. 1979), seems to require this approach. In *Ortiz,* the defendant United States impleaded a third party defendant under a federal law claim. The plaintiff then attempted to sue the impleaded party on a pendent state law claim. The Court resolved the pendent jurisdiction problem by looking *both* to the constitution and to congressional intent. The Court examined congressional intent despite the United States' argument that congressional intent was irrelevant in pendent claim cases. The United States contended that the case at bar presented a classic pendent *claim* problem because a nonfederal claim was being asserted against a party against whom a federal claim was also pending. The Court noted that:

> While the approach advocated by the government may seem reasonable in light of *Gibbs* and *Aldinger,* we think our approach may be the correct one when *Kroger* is taken into account. In *Kroger* the Court advocated consideration of both Article III and congressional intent without attempting to classify the case before it as being either a pendent party or a pendent claim action.
>
> In any event we decline to reach the issue as to which of these two approaches constitutes the correct reading of the *Gibbs-Aldinger-Kroger* trilogy because under either approach our decision con-

cerning the district court's right to exercise jurisdiction over the nonfederal claim in the present case would be the same. *Id.* at 71 n. 9.

Thus, although Amoco's suit involves a typical pendent *claim* question because the defendants are properly in federal court under independent bases of federal jurisdiction, the Court must determine whether both Article III and statutory power to exercise pendent jurisdiction exist. It is clear that Article III power exists. First, Amoco's federal common law and § 1985(3) claims against both the unions and their members are not jurisdictionally insubstantial.[35] The same is true for its claims against the unions under 29 U.S.C. §§ 158(b)(4)(B), 187. Second, Amoco's state law claims of interference with business relationships, destruction of property, and trespass clearly arise out of the same nucleus of facts on which its federal claims rest. Amoco would certainly be expected to litigate both sets of claims in one suit. Thus, Amoco satisfies the test set out in *Gibbs* for constitutional power to exercise pendent jurisdiction.

The Court also finds that it has statutory power to take pendent jurisdiction in this case. The relevant jurisdictional statutes are 28 U.S.C. §§ 1331 and 1343(a)(1) and 29 U.S.C. § 187(b). Section 1331 provides expansively for jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. In equally broad language, § 1343(a)(1) grants jurisdiction over "any civil action authorized by law to be commenced by any person to recover damages for injury to . . . person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in" § 1985. 28 U.S.C. § 1343(a)(1). Finally, 29 U.S.C. § 187(b), which is a basis for jurisdiction only over the labor law claims against the unions, provides for federal and state court jurisdiction over suits for damages due to violations of 29 U.S.C. § 158(b)(4).

■ Because Congress has not expressly negated the exercise of pendent jurisdiction in §§ 187(b), 1343(a)(1), or 1331, the Court must determine whether these statutes implicitly negate such jurisdiction. The local union members argue that Congress' decision not to subject them to damages liability for unlawful secondary conduct under 29 U.S.C. §§ 158(b)(4)(B), 187(a), which Amoco claims the unions have violated, implies an intent to negate pendent jurisdiction over state law claims against them arising out of the same secondary conduct. Furthermore, the local unions contend that Congress' choice not to allow awards of punitive damages against labor organizations under § 187 implicitly indicates an intent to prohibit pendent jurisdiction over Amoco's state law claim against them for such damages. The Court disagrees with both contentions.

It is true that the Supreme Court in *Aldinger v. Howard* suggested that courts look to the scope of the substantive federal causes of action in a case, over which Congress has extended judicial power, in determining whether Congress intended to negate pendent jurisdiction over particular state law claims. 427 U.S. at 17, 96 S.Ct. at 2421. In *Aldinger*, the Court looked to the scope of § 1983 to construe the jurisdictional grant in § 1343(a)(3), which was enacted at the same time as § 1983 and which contains almost identical language as § 1983. Section 1343(a)(3), the only jurisdictional statute involved in *Aldinger*, and section 1983 were such close analogues of each other that the Court found that Congress' exclusion of municipalities from liability in § 1983 strongly implied an intent not to allow pendent jurisdiction over the defendant municipality through § 1343(a)(3).

Amoco's situation, however, is strikingly different from that in *Aldinger*. In this case, several federal causes of action, arising under federal common law and § 1985(3) as well as 29 U.S.C. § 187(b), are alleged. Moreover, several jurisdictional provisions are involved, including the broad-

---

**35.** It is well settled that a claim may be jurisdictionally substantial, but prove ultimately unmeritorious. *E.g., Rumbaugh v. Winifrede R.* R. *Co.,* 331 F.2d 530, 540 n. 19 (4th Cir.), *cert. denied,* 379 U.S. 929, 85 S.Ct. 322, 13 L.Ed.2d 341 (1964).

ly worded grant of jurisdiction in § 1331. Thus, although the limitations on individual damages liability and punitive damages under § 187 *might* imply a negation of pendent jurisdiction over similar state claims for such relief *in a case arising exclusively under § 187(b)*, the scope of a § 187 cause of action is not dispositive where a case involves several other federal causes of action and several other grants of federal jurisdiction. Congress' possible intent as to pendent jurisdiction under § 187(b) sheds little or no light on its intent regarding §§ 1331 or 1343(a)(1).

Thus, despite the defendants' arguments, the Court concludes that neither § 187(b) nor the "broad grants of jurisdiction" in §§ 1331 and 1343(a)(1) implicitly negate the existence of pendent jurisdiction in this case. *See FDIC v. Otero*, 598 F.2d 627, 631 (1st Cir. 1979) (finding no implied intent to exclude pendent party or claim given the "broad grant of jurisdiction" in 12 U.S.C. § 1819(4)). Of particular significance in ascertaining this intent is the procedural context in which the state law claims in this case are asserted. *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. at 375–76, 98 S.Ct. at 2403–04 (procedural context "crucial"); *Ortiz v. United States*, 595 F.2d at 71–72 (same). The individual defendants as well as the local unions are properly in this court under independent bases of federal jurisdiction. Absent compelling policy reasons suggesting otherwise, it is reasonable to assume that Congress would want courts to be able to adjudicate *all* claims against such parties properly in federal court if it would be in the interest of judicial economy, fairness, and convenience.

Thus, having both constitutional and statutory power to exercise pendent jurisdiction over state law claims in this suit, the Court must decide in its discretion whether to do so. The Court believes that it is proper to take pendent jurisdiction in this suit. Were the local union members the only defendants in this action, the Court would most likely dismiss the pendent claims because all federal claims against the individuals have already been dismissed. *See United Mine Workers v. Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139 (if all federal claims dismissed before trial, court should not take pendent jurisdiction over state claims). However, this case will proceed to trial against the unions on Amoco's § 187 claims. Thus, both judicial economy and convenience counsel for adjudicating all of Amoco's claims against both the unions and the individuals in one forum. Furthermore, the issues of state law in this case do not, on first blush, seem so complex as to require "surer footed" resolution in the state courts. *See United Mine Workers v. Gibbs, supra*, at 726, 86 S.Ct. at 1139. Thus, it would not be unfair for this federal court to adjudicate them. Finally, principles of comity do not weigh heavily in favor of state court adjudication of the pendent claims. Rather, the possibility that some of Amoco's state law claims may be preempted by the national labor laws "afford[s] a special reason for the exercise of pendent jurisdiction; the federal courts are particularly appropriate bodies for the application of preemption principles." *Id.* at 729, 86 S.Ct. at 1140. The motions to dismiss the pendent state claims are therefore denied.

VI. *Motion To Dismiss Claim For Punitive Damages*

Count Eleven of Amoco's complaint seeks punitive damages under Rhode Island law, apparently against both the unions and the individual defendants, for their allegedly violent acts and threats of violence. *See* Amoco's Memorandum in Opposition to Motion to Dismiss at 30–31. The local unions and their individual members move to dismiss this claim on the grounds that: (1) punitive damages are not available under 29 U.S.C. § 187 for unlawful secondary activity; and (2) the court should not exercise pendent jurisdiction over a pendent claim for punitive damages under state law. Defendants apparently concede that 29 U.S.C. § 187 does not preempt a state cause of action for punitive damages where violent secondary conduct is alleged. This Court has already concluded that it will take pendent jurisdiction over all state law claims in this case, and finds that the national labor laws do not prohibit an award of punitive damages for violent secondary conduct where available under state law.

It is clear that the national labor laws do not preempt the operation of state law where "violence [or] threats of violence [occur in the course] of labor disputes." *United Mine Workers v. Gibbs*, 383 U.S. at 729, 86 S.Ct. at 1140. *Accord Local 20, Teamsters Union v. Morton*, 377 U.S. 252, 257, 84 S.Ct. 1253, 1257, 12 L.Ed.2d 280 (1964); *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 247–48, 248 n. 6, 79 S.Ct. 773, 780–81, 781 n. 6, 3 L.Ed.2d 775 (1959) (states may regulate "conduct marked by violence and imminent threats to the public order"); *United Construction Workers v. Laburnum Construction Corp.*, 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025 (1954) (sustaining damages award under state law where union agents "threatened and intimidated...plaintiff's officers...with violence"); *Gulf Coast Building & Construction Trades Council v. F. R. Hoar & Son, Inc.*, 370 F.2d 746, 748 (5th Cir. 1967); *Price v. United Mine Workers*, 336 F.2d 771, 774–75 (6th Cir. 1964), *cert. denied*, 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965). Thus, although punitive damages are never available under 29 U.S.C. § 187 for unlawful secondary activity, *Ritchie v. United Mine Workers*, 410 F.2d 827, 836 (6th Cir. 1969); *see United Mine Workers v. Gibbs, supra*, at 721, 729, 86 S.Ct. at 1136, 1140; 29 U.S.C. § 187(b) ("[w]hoever shall be injured in his business or property...shall recover *the damages by him sustained*") (emphasis added), a plaintiff may recover such damages, if available under state law, where violence or threats of violence accompany secondary conduct. *Ritchie v. United Mine Workers, supra*, at 836; *Gulf Coast Building & Construction Trades Council v. F. R. Hoar & Son, Inc., supra*, at 748; *Price v. United Mine Workers, supra*, at 774–75; *Great Coastal Express, Inc. v. International Brotherhood of Teamsters*, 350 F.Supp. 1377, 1379 n.2 (E.D.Va.1972), *aff'd on other grounds*, 511 F.2d 839 (4th Cir. 1975) (dicta). *See United Mine Workers v. Gibbs, supra*, at 729–41, 86 S.Ct. at 1140–46 (analyzing whether plaintiff sufficiently alleged and proved acts of violence in secondary activity such that an award of punitive damages under state law would not be preempted by 29 U.S.C. § 187).

██ Rhode Island law permits the award of punitive damages for torts "involving malice, wantonness, or wilfulness." *Bibeault v. Hanover Insurance Co.*, 417 A.2d 313, 319 (R.I.1980); *Berberian v. New England Telephone & Telegraph Co.*, 369 A.2d 1109, 1112 (R.I.1977); *Worthington v. Shewcov*, 152 A.2d 91, 93 (R.I.1959). One seeking punitive damages must thus produce "evidence of such willfulness, recklessness, or wickedness, on the part of the party at fault, as amount[s] to criminality, which for the good of society and warning to the individual, ought to be punished." *Sherman v. McDermott*, 329 A.2d 195, 196 (R.I. 1974). *Accord T & S Service Associates, Inc. v. Crenson*, 505 F.Supp. 938, 945 (D.R.I.) (Boyle, J.), *vacated on other grounds*, 666 F.2d 722 (1st Cir. 1981); *Holmes v. Bateson*, 434 F.Supp. 1365, 1390 (D.R.I.1977), *aff'd in part and rev'd in part on other grounds*, 583 F.2d 542 (1st Cir. 1978) (Day, J.). Thus, Amoco may be able to recover punitive damages in this suit if it proves that acts or threats of violence occurred, and if it satisfies the Rhode Island standard for such damages.[36]

### VI. *Motion To Strike*

In its complaint, Amoco states that it filed an unfair labor practices action with the NLRB against the defendants, and it describes the course of proceedings before the Board. The local unions and their individual members move to strike from the

---

**36.** The Court expresses no opinion on whether proof of *actual* damages is necessary in order to recover *punitive* damages under Rhode Island law. Furthermore, the Court does not decide whether the individual union members may be liable for punitive—or compensatory—damages for their alleged violent acts, or whether national labor policy forecloses individual liability under state law for their violent secondary conduct. *See Complete Auto Transit, Inc. v. Reis*, 101 S.Ct. at 1843–44 (strong federal policy to immunize union members from liability under 29 U.S.C. § 187). The Court therefore requests further briefing on these two issues, as well as on the general question of whether federal law has preempted any of Amoco's state law claims (other than that against the unions for punitive damages for violent conduct).

complaint all references to these NLRB proceedings pursuant to Fed.R.Civ.P. 12(f).[37] The defendants argue that these references are immaterial and irrelevant. The Court disagrees and denies defendants' motion.

■ Courts regard motions to strike with disfavor. *Russo v. Merck & Co.,* 138 F.Supp. 147, 148–49 (D.R.I.1956) (Day, J.); 2A J. Moore & J. Lucas, Moore's Federal Practice ¶ 12.21, at 2429–31 (2d ed. 1981). *See Narragansett Tribe of Indians v. Southern Rhode Island Land Development Corp.,* 418 F.Supp. 798, 801 (D.R.I.1976) (Pettine, J.). Absent a showing that the challenged material in the complaint has no relation to the controversy, or is clearly prejudicial to the movant, courts should deny motions to strike. *Russo v. Merck, supra,* at 149; 2A J. Moore & J. Lucas, Moore's Federal Practice ¶ 12.21, at 2429–31 (2d ed. 1981).

■ The references to NLRB proceedings in Amoco's complaint are not clearly prejudicial to the defendants. Furthermore, these references are at least relevant to the issue of attorney's fees recoverable for litigation before the NLRB. *See F. F. Instrument Corp. v. Union de Tronquistas de Puerto Rico,* 558 F.2d 607, 611 (1st Cir. 1977) (suggesting that attorney's fees may be available under 29 U.S.C. § 187 for proceedings before NLRB where "incurred in removing an illegal picket line or otherwise directly in mitigation of harm"). Thus the Court denies defendants' motion to strike.

### Conclusion

1) The following motions are hereby granted:

a) motion by officers of the IBEW, Plumbers, and Carpenters to dismiss for lack of personal jurisdiction; they will be dismissed unless within ten days from the date of this opinion Amoco submits a detailed schedule for discovery as to these individuals' contacts with Rhode Island (see pp. 1210–1211 *supra*);

b) motions by local union officers to dismiss all federal claims against them;

c) motion by local unions to dismiss federal common law and 42 U.S.C. § 1985(3) claims against them;

2) The following motions are hereby denied:

a) motion by local union officers to dismiss all pendent state law claims against them;

b) motion by local unions to dismiss pendent claim for punitive damages against them;

c) motion by local union officers to strike certain material from Amoco's complaint;

3) The following motion is passed as moot: motion to dismiss for inadequate service of process. *See* note 6 *supra.* So Ordered.

---

**37.** Fed.R.Civ.P. 12(f) provides:

Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon him or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.